**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 21 2005**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

L.C. and K.C., as individuals and as guardians on behalf of N.C., their minor child, and as class representatives of all others similarly situated,

Plaintiffs-Appellants,

v.

THE UTAH STATE BOARD OF EDUCATION; UTAH STATE DEPARTMENT OF EDUCATION; SCOTT W. BEAN, in his official capacity as Utah State Superintendent of Public Instruction; STEVAN KUKIC, in his official capacity as Director of Special Education Services, Utah State Office of Education; MAE TAYLOR-SWEETEN, individually and in her official capacity as Coordinator, Special Education State and Federal Compliance Officer; OGDEN CITY SCHOOL DISTRICT; MICHAEL PASKEWICZ, in his official capacity as Superintendent, Ogden City School District; BEVERLY WILCOX, in her official capacity as Special Education Director, Ogden City School District; JOHN DOES 1 through 100,

Defendants-Appellees.

No. 04-4060
(D.C. No. 2:98-CV-207-C)
(Utah)

---

## ORDER AND JUDGMENT[*]

Before **KELLY**, **McWILLIAMS**, and **LUCERO**, Circuit Judges.

Plaintiffs L.C. and K.C. brought this lawsuit as individuals and as guardians of N.C., their minor child. This dispute arises from L.C. and K.C.'s dissatisfaction with the special education and related services provided for N.C. by the Ogden City School District ("Ogden") for N.C.'s sixth and seventh grade years. After withdrawing N.C. from Ogden, plaintiffs sought a due process hearing claiming that Ogden failed to provide N.C. with a free appropriate public education ("FAPE") as required by the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1411 et seq. The hearing officer having denied their claim, and the denial having been affirmed on administrative appeal, plaintiffs sought review of their substantive IDEA claim by the district court and alleged that the hearing violated IDEA's procedural guarantees. In separate orders the district court granted summary judgment to Ogden on plaintiffs' procedural claim and affirmed the hearing officer's decision. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and **AFFIRM** both orders.

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

**I**

"The IDEA is a comprehensive statute enacted to ensure that all children with disabilities have access to a free and appropriate public education designed to meet their unique needs." Murray v. Montrose County Sch. Dist., 51 F.3d 921, 925 (10th Cir. 1995). It contains substantive requirements to ensure that each child receives a FAPE. Additionally, in the event that a parent objects to the quality of special education provided to her child, the IDEA provides an administrative procedure by which the parent may present her grievances and seek a remedy. This procedure involves an adversarial hearing before a hearing officer, after which the hearing officer issues a written decision adjudicating the parent's claim. Following an appeal to an administrative review panel, the federal district court may properly review the hearing officer's decision.

When reviewing a hearing officer's decision under IDEA, a district court uses a modified de novo standard of review. See, e.g., L.B. v. Nebo Sch. Dist., 379 F.3d 966, 973 (10th Cir. 2004). Rather than employing the substantial evidence standard typically used when reviewing an administrative agency decision, the court "must decide independently whether the requirements of the IDEA are met." Murray, 51 F.3d at 927. In doing so, a court must accord "due weight" to the hearing officer's factual findings, which are considered prima facie correct, and "grant a judgment on the record based on its own ascertainment of

the preponderance of the evidence." L.B., 379 F.3d at 974. At all times, "the burden of proof in these matters rests with the party attacking the child's individual education plan." Johnson v. Indep. Sch. Dist. No. 4, 921 F.2d 1022, 1026 (10th Cir. 1990).

Under the circumstances of this case, the district court's disposition is best termed "a judgment on the administrative agency's record" and not a grant of summary judgment. L.B., 379 F.3d at 974. When reviewing a district court's judgment on the agency record, an appellate court does not ask whether there exist genuine issues of material fact; rather, an appellate court reviews the district court's decision de novo, and applies the same IDEA standard that the court below employed. Id. We must therefore review the record ourselves and "decide independently whether the requirements of the IDEA are met," Murray, 51 F.3d at 927, while giving "due weight" to the hearing officer's factual findings. L.B., 379 F.3d at 974. Our review of the record reveals the following facts.

While enrolled as a student in Ogden, N.C. qualified to receive special education and related services under IDEA. He suffered from a number of disorders, including anxiety, epilepsy, and a spastic colon. During his sixth and seventh grade years, N.C. received various special education services prescribed in an individualized education program ("IEP") pursuant to the requirements of IDEA.

In the summer before N.C.'s sixth grade year, plaintiffs met at least four times with a team at Ogden to develop an IEP. The IEP team consisted of N.C.'s parents, his case manager, several of his sixth grade teachers, and the Director of Special Education for Ogden. The members of the IEP team reviewed and considered the following information about N.C. in crafting the IEP: (1) his I.Q.; (2) his learning and emotional challenges; (3) his fifth grade end-of-the-year scores; (4) his fifth grade SAT scores; (5) a psychological evaluation; (6) the Brigance Comprehensive Inventory of Basic Skills test; (7) physician's evaluations; and (8) discussions with his parents. Pursuant to the IEP, N.C.'s sixth grade goals consisted of comprehending a sixth grade level reading selection, demonstrating an ability to complete written work and take notes, and performing math computations using whole numbers. K.C. requested that Ogden exclude speech testing and therapy from the IEP.

In general, Ogden exposed N.C. to the regular sixth grade curriculum. However, Ogden ensured that N.C. would not have to complete a test or assignment that was beyond his capabilities. Additionally, when information was presented to other students in a form that was too complicated for N.C. to comprehend, Ogden would ordinarily simplify the material or teach it to N.C. in smaller segments.

N.C. struggled with anxiety in sixth grade, and in October of N.C.'s sixth grade year, K.C. met with several IEP team members to discuss ways that Ogden could accommodate N.C.'s growing anxiety. The team agreed that N.C. should not be required to take assignments home, that he would be graded solely on his in-class work, and that he should receive "an unlimited hall pass." Additionally, because N.C. demonstrated limited abilities to copy information and take notes, the team eliminated the IEP's writing goals. Instead, N.C. was to receive copies of notes taken by a peer or a staff assistant. Although Ogden imposed the revised accommodations immediately, the team did not update the IEP until March of N.C.'s sixth grade year.

Despite their awareness of Ogden's special accommodations for N.C., teachers would at times assign N.C. homework. On those occasions, Ogden would inform K.C. that N.C. should not do the homework but should instead write "as per contract, no homework" on the assignment and submit it to the teacher. On other occasions, teachers – acting pursuant to the IEP – sent work samples with N.C. so that K.C. could review what N.C. was learning in class; K.C. would misconstrue the papers as homework.

Although K.C. originally requested that N.C. attempt mainstream classes, by March of his sixth grade year it became apparent that N.C. required more special education classes. Accordingly, Ogden changed N.C.'s schedule and

provided him with special education in a majority of his classes. These classes were either taught by a resource teacher or co-taught by a mainstream teacher and a special education teacher.

In April of his sixth grade year, N.C. received speech, language, and hearing screenings at Primary Children's Medical Center ("PCMC") where he was receiving in-patient psychiatric treatment. PCMC determined that N.C. struggled with receptive and expressive language skills. N.C.'s seventh grade IEP, which the team formulated in August before his seventh grade year, indicates that Ogden was "waiting for speech/language results from Primary Children's Hospital." Ogden received the test results at some point after formulating N.C.'s IEP, however they did not perform further tests or provide N.C. with treatment.

Before N.C. returned to Ogden, the IEP team met with medical professionals at PCMC to develop a plan to assist N.C. in his transition back to school. To address his anxiety, Ogden agreed to provide N.C. with a room in which he could spend "quiet time" following an anxiety episode. The IEP team agreed that changing N.C.'s goals and objectives would be counterproductive.

K.C. joined Ogden's special education coordinator, N.C.'s seventh grade case manager, and several special education teachers on a team to formulate N.C.'s seventh grade IEP. The team based the IEP on relevant sixth grade tests, reports, physician evaluations, information from N.C.'s sixth grade teachers, a

comprehensive three-year evaluation conducted in sixth grade, and contributions from N.C.'s parents. In the IEP, the team established specific goals for N.C. with respect to reading comprehension, communication and social skills, and mathematic aptitude.

Additionally, N.C.'s seventh grade IEP contained the following accommodations: N.C. will be given copies of all work presented on the blackboard, will be graded based on the work completed in class, will not receive homework, will have a room in which he can recover following an anxiety episode, will receive a "good note home" each day that N.C. "makes it without an episode," will be seated close to the front of each classroom, will have an "unlimited hall pass," and will be permitted to move freely about the classroom every twenty minutes. If a teacher assigned a task requiring visual perceptive abilities, N.C. was to receive an alternative assignment. Additionally, if an assignment were too difficult for N.C. to complete, even with the assistance of the special education teacher assigned to help him in his mainstream classes, the mainstream teacher would give N.C. a substitute assignment. Such assignments for each class were kept in a "plan B folder."

In the fall of N.C.'s seventh grade year, Ogden's augmentative communication team began assisting him. The team consists of occupational therapists, physical therapists, speech therapists, psychologists, and other

professionals from Ogden and a neighboring school district. They receive referrals from both districts to evaluate students with communication difficulties and to recommend assistive devices. After receiving a referral for N.C., the team produced and reviewed a videotape of N.C. performing various communication tasks. Upon review of the tape, the team concluded that N.C. would benefit from using a program called "Dragon Dictate," which is a speech-to-text computer program. A user speaks into a microphone attached to a computer, and Dragon Dictate software translates the speech into written form in a word processing program.

To train a user, Dragon Dictate utilizes 40 tutorials, each taking approximately twenty minutes to complete. Robert Green, the Ogden school psychologist, assisted N.C. in completing some of the tutorials. In December, the Dragon Dictate distributor began offering an updated version of the program. Upon Green's recommendation, Ogden purchased the new version and Green began to train N.C. to use it. Because Ogden did not receive the new version until the Spring of N.C.'s seventh grade year, and N.C. left Ogden on April 10th, he never completed the recommended three-month tutorial. Additionally, by the spring N.C. began to favor using a keyboard-based word processing program for written expression. Because he demonstrated sufficient typing skills, Ogden permitted him to focus on using the keyboard instead of Dragon Dictate.

One additional accommodation that Ogden made for N.C. in seventh grade was to institute “grade contracts.” In these grade contracts, N.C.’s teachers would delineate what work he needed to perform to obtain a given grade. Although a teacher at Ogden testified that he procured grade contracts for each of N.C.’s classes, and K.C. testified to seeing a grade contract at a meeting with one of N.C.’s teachers, Ogden failed to produce the contracts at the due process hearing.

In April of N.C.’s seventh grade year, his parents withdrew him from Ogden and enrolled him in a private school, the Special Educational Programming Service (“SEPS”). At SEPS, N.C. experienced fewer anxiety attacks and enjoyed good relationships with his fellow students.

In September of N.C.’s eighth grade year, while he was enrolled at SEPS, L.C. and K.C. requested a due process hearing and alleged that Ogden failed to comply with IDEA. Pursuant to rules applicable at the time, a hearing officer would be selected by mutual agreement of the parties. If the parties could not agree, the State Superintendent would appoint the hearing officer. Both Ogden and the plaintiffs submitted names of potential hearing officers. Because Dr. Cregg Ingram appeared on both parties’ lists, he was selected as the hearing officer.

After Ogden accused Ingram of inappropriate ex parte contacts with the plaintiffs, Ingram voluntarily recused himself. Dr. Mae Taylor, an official with

the State Office of Education, received new lists of potential hearing officers from the parties. Plaintiffs submitted three names and Ogden submitted one: Dr. Ralph Haws. Because the parties failed to agree on a hearing officer, it became the State Superintendent's responsibility to appoint someone to fill that role. After reviewing the potential appointees, Dr. Taylor and Dr. Steven Kukic, another state official, recommended Dr. Haws as the officer. The State Superintendent approved their recommendation. Dr. Haws had never been an employee of Ogden or the State Office of Education.

Because of the time consumed in selecting Dr. Haws as the hearing officer, he ordered an extension of time within which to hold the due process hearing. The hearing was conducted over five separate days in 1997, during the spring of N.C.'s eighth grade year. On several occasions, K.C. witnessed Haws conversing with Ogden's counsel after that day's hearing concluded. After reviewing the briefs, witness testimony, and exhibits, Dr. Haws submitted his Due Process Decision and Order. Haws concluded that Ogden provided N.C. with a FAPE, that N.C.'s IEPs conformed with IDEA's requirements, and that the IEPs were designed to accord educational benefit to N.C. In a letter to Ogden accompanying an invoice for his services – sent after he issued his decision and order – Dr. Haws stated: "[i]f I can provide you with any future support in matters related to special education issues, or I can assist you in mediating issues related to

personnel grievances, termination and/or probations with your personnel associations, please give me a call." Plaintiffs appealed Dr. Haws' order to a state education agency panel, which affirmed the decision.

Plaintiffs then sued Ogden, along with numerous co-defendants, in district court. They alleged that the defendants violated their rights under IDEA by failing to provide N.C. with a FAPE, by selecting a biased hearing officer, and by holding the hearing in an untimely fashion. They sought compensation for the educational expenses they incurred at SEPS. Plaintiffs also sued under 42 U.S.C. § 1983, alleging that the defendants failed to provide N.C. with a FAPE and that the hearing violated their constitutional due process rights. The district court concluded that § 1983 is not available to enforce a state's statutory obligations under IDEA, that the hearing did not violate plaintiffs' procedural due process rights or their procedural rights under IDEA, that all defendants – except Ogden and one defendant sued in her individual capacity – are entitled to Eleventh Amendment immunity, and that the aforementioned individual defendant is entitled to qualified immunity. The district court then entered summary judgment for the defendants on plaintiffs' § 1983 and procedural IDEA claims. In a separate order, the district court reviewed the administrative record and affirmed the hearing officer's decision and order with respect to plaintiffs' substantive IDEA claim.

On appeal, plaintiffs challenge both the district court's grant of summary judgment to Ogden on plaintiffs' procedural IDEA claim and the district court order affirming the hearing officer's decision and order. Plaintiffs do not appeal the grants of Eleventh Amendment immunity or qualified immunity, nor do they appeal the district court's grant of summary judgment on plaintiffs' § 1983 claim. They continue to seek compensation for expenses incurred by sending N.C. to SEPS.

**II**

Based on the preponderance of the evidence in the administrative record, the district court concluded that Ogden complied with IDEA and provided N.C. with a FAPE. Mindful that "the 'basic floor of opportunity' provided by [IDEA] consists of specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child," Bd. of Educ. v. Rowley, 458 U.S. 176, 201 (1982), we agree with the district court. It is clear that Ogden provided specialized instruction and related services that were individually designed to provide N.C. with educational benefit. We also agree that the administrative hearing complied with IDEA.

**A**

Plaintiffs appear to argue that the preponderance of the evidence belies the hearing officer's conclusion that Ogden provided N.C. with a FAPE during his

sixth and seventh grade years. Upon our review of the record, we conclude that the hearing officer properly decided this matter. Therefore, we affirm the district court's decision affirming the hearing officer's decision and order.

First, plaintiffs complain that Ogden inadequately accommodated N.C.'s limited ability to write with a pen or pencil. We disagree. In sixth grade, N.C.'s IEP – prepared with the full participation of K.C. – contained two goals relating to N.C.'s ability to complete written work and take notes. When N.C. struggled to achieve those goals, the IEP team removed them and accommodated N.C. by ensuring that he would receive copies of all notes. At the beginning of his seventh grade year, Ogden recommended that N.C. receive an evaluation from the augmentative team. Upon the team's recommendation, an Ogden school psychologist began to train N.C. to use Dragon Dictate. When a superior version of the program came out, Ogden purchased it and began to assist N.C. in using it. Ogden also provided N.C. with instruction in using a computer keyboard. Pursuant to 34 CFR § 300.350(a), the relevant public agency must "[m]ake a good faith effort to assist the child to achieve the goals and objectives or benchmarks listed in the IEP." Ogden made more than a good faith effort to assist N.C. in this area. We therefore agree with the district court that the preponderance of the evidence supports Dr. Haws' conclusion that Ogden appropriately accommodated N.C.'s writing limitations.

Next, plaintiffs argue that Ogden's failure to follow up on PCMC's speech test results contributed to N.C.'s lack of a FAPE. IDEA does not require Ogden to provide "every special service necessary to maximize" N.C.'s potential. Rowley, 458 U.S. at 199. We have made clear that we must be "mindful of the Supreme Court's caution in Rowley that the 'appropriate' education required by the Act is not one which is guaranteed to maximize the child's potential." Johnson, 921 F.2d at 1028-1029. Furthermore, the record indicates that plaintiffs contributed to Ogden's confusion over this issue. Although the IEP team suggested providing N.C. with speech testing and therapy at the beginning of sixth grade, K.C. objected. Accordingly, the plaintiffs have failed to satisfy their burden on this point.

Because some teachers occasionally sent work home with N.C., plaintiffs argue that Ogden failed to implement properly N.C.'s IEP. Although "a school district can[not] ignore the fact that an IEP is clearly failing," O'Toole v. Olathe Dist. Schs. Unified Sch. Dist., 144 F.3d 692, 702 (10th Cir. 1998), Ogden's deviations do not amount to a clear failure. When a teacher would erroneously assign N.C. homework, Ogden would instruct K.C. to write "as per contract, no homework" on the assignment and submit it to the teacher. Additionally, there is no indication that N.C. was ever graded on this homework. The record also indicates that on several occasions K.C. misconstrued in-class work samples – of

which she requested copies for her review – as homework. We agree with the district court that the hearing officer properly determined that Ogden did not violate IDEA by occasionally assigning homework to N.C.

Plaintiffs next allege that Ogden failed to implement properly the IEP with respect to grade contracts. Specifically, because Ogden failed to produce the grade contracts at the due process hearing, and witnesses could recall seeing a grade contract for only one class, plaintiffs allege that Ogden did not provide grade contracts for any other class. Dr. Haws determined that such insinuations do not amount to a preponderance of the evidence satisfying plaintiffs' burden of proof. We agree.

In October of N.C.'s sixth grade year, after he displayed tremendous anxiety, the IEP team met and instituted numerous accommodations to alleviate N.C.'s anxiety. The team did not memorialize these accommodations on the IEP until March. Plaintiffs argue that the "[a]ccommodations should have been written down immediately upon [N.C.'s] entry to school." (Appellant's Br. at 47). Failure to write down accommodations immediately does not constitute a violation of IDEA, and plaintiffs have cited to no authority suggesting otherwise. Plaintiffs further argue that the accommodations failed because N.C. had an emotional breakdown in the spring of his sixth grade year. IDEA does not require Ogden to have prevented N.C. from suffering the effects of his anxiety; rather,

Ogden must have accommodated N.C.'s challenges, which it did. "Congress expressly recognized that in many instances the process of providing special education and related services to handicapped children is not guaranteed to produce any particular outcome. Thus, the intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." Rowley, 458 U.S. at 192 (citation omitted). Plaintiffs have failed to demonstrate that Ogden did not open its doors to N.C.

Plaintiffs also complain that N.C.'s initial sixth grade curriculum was improper. The record demonstrates that at all times, Ogden provided N.C. with appropriate accommodations. N.C. never had to complete a test or assignment that was beyond his capacity. Furthermore, if information were presented in a complicated form, Ogden would ordinarily simplify the material or teach it to N.C. in smaller segments. Ogden also supplied N.C. with special education staff support to assist N.C. in his mainstream classes. Where N.C.'s limitations proved prohibitive – such as his inability to perform in choir – Ogden removed him from the class and adjusted his schedule. Ogden provided N.C. "access to specialized instruction and related services which [were] individually designed to provide educational benefit to" him, and therefore complied with IDEA. Rowley, 458 U.S. at 201.

Finally, plaintiffs argue that the improvements that N.C. made at SEPS demonstrates that Ogden failed to provide him with a FAPE. Success at a private institution is not probative of whether the public school provided a FAPE. See O'Toole, 144 F.3d at 708 ("an IEP is not inadequate simply because parents show that a child makes better progress in a different program.").

The education with which Ogden provided N.C. complied with IDEA. Accordingly, we affirm the district court's order affirming the decision and order entered by the hearing examiner.

**B**

Plaintiffs appeal the district court's grant of summary judgment on their procedural IDEA claims. We review a district court's grant of summary judgment de novo, using the same standards applied by the district court. Byers v. City of Albuquerque, 150 F.3d. 1271, 1274 (10th Cir. 1998). We view the evidence and reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party. Id.

First, plaintiffs allege that Dr. Haws was not an impartial hearing officer. In support, they argue that Ogden pressured Ingram – the initial hearing officer – to resign, that Haws had several ex parte conversations with Ogden's counsel, and that Haws solicited further work from Ogden after issuing his decision. A hearing officer shall "at a minimum" not be "an employee of the State educational

agency or the local educational agency involved in the education or care of the child; or a person having a personal or professional interest that conflicts with the person's objectivity in the hearing." 20 U.S.C. § 1415(f)(3)(A)(i). We have held that a hearing officer need only meet "the minimum standard of impartiality set out in the statute." L.B., 379 F.3d at 975. Dr. Haws had never been an employee of Ogden or the State Office of Education. As such, we must consider him impartial as defined by IDEA. Additionally, Dr. Haws "enjoys a presumption of honesty and integrity, which is only rebutted by a showing of some substantial countervailing reason to conclude that [he] is actually biased with respect to factual issues being adjudicated." Harline v. Drug Enforcement Admin., 148 F.3d 1199, 1204 (10th Cir. 1998) (citation omitted). Plaintiffs innuendoes do not amount to a "substantial countervailing reason" compelling us to conclude that Dr. Haws was a biased adjudicator.

Next, plaintiffs argue that Dr. Haws violated IDEA by granting a lengthy extension of time within which to hold hearings and issue a final decision. Although IDEA requires a hearing officer to issue a final decision within forty-five days of the receipt of a request for a hearing, a "hearing or reviewing officer may grant specific extensions of time beyond" that statutory period. 34 CFR § 300.511(c). Dr. Haws' decision to grant the extension, even such a considerable extension, is authorized by the governing regulation. Furthermore,

given the lengthy dispute over the initial hearing officer, the time consumed selecting Dr. Haws, and the factual complexity of this case, Dr. Haws held hearings and issued his decision within a reasonable amount of time. We agree with the district court that the extension of time did not violate plaintiffs' rights under IDEA.

**III**

We **AFFIRM** the district court's grant of summary judgment on plaintiffs' procedural IDEA claim. Furthermore, we agree with the district court that Ogden complied with IDEA's substantive requirements and **AFFIRM** the district court's order affirming the hearing officer's Due Process Decision and Order.

ENTERED FOR THE COURT

Carlos F. Lucero
Circuit Judge