Natalie JOHNSON, a minor who sues By and Through Fred and Jennifer JOHNSON, her father and mother, as next friends, Plaintiff–Appellant,

v.

INDEPENDENT SCHOOL DISTRICT NO. 4 OF BIXBY, TULSA COUNTY, OKLAHOMA; Oklahoma State Department of Education; Children's Developmental Center, Defendants–Appellees.

No. 89–5111.

United States Court of Appeals, Tenth Circuit.

Dec. 11, 1990.

Lowell Thomas Price, Jr., of Protection & Advocacy Agency, Tulsa, Okl., for plaintiff-appellant.

Andrea K. Allbritton, of Rosenstein, Fist & Ringold, Tulsa, Okl. (John G. Moyer, Jr. with her on the briefs), for defendant-appellee Independent School District No. 4 of Bixby, Tulsa County, Okl. and defendant-appellee Children's Developmental Center.

Kay Mildren, Oklahoma State Dept. of Educ., Oklahoma City, Okl., for defendant-appellee Oklahoma State Dept. of Educ.

Before HOLLOWAY, MOORE and BRORBY, Circuit Judges.

PER CURIAM.

This case involves an action brought under the Education of All Handicapped Children's Act, 20 U.S.C. §§ 1400–1485 (1989), as implemented by 34 C.F.R. §§ 300.1–300.-754 (1989) (collectively referred to as "the Act"). Natalie Johnson is a severely and multiply handicapped child who was eight years old at the time her local school district rejected her parents' request for a structured summer educational program. Natalie's parents invoked the due process provisions of the Act, and the schools' decision was administratively and judicially affirmed. There are two issues on appeal: (1) What information should be considered as a basis for entitlement under the Act to a free extended year school program in addition to the traditional September through May nine-month school program?

(2) In Oklahoma, is the cooperative special education service provider a necessary party to the due process procedure mandated by the Act? As to the first issue, we reverse the district court's grant of summary judgment in favor of the schools because insufficient information was utilized in both the administrative proceedings and the district court to satisfy the Act's procedural requirement for individualized review of Natalie's program plan. As to the second issue, we conclude that the special education cooperative unit is a not necessary party to this action.

## I.

It is undisputed that Natalie has profound autistic defenses with at least moderate mental retardation and seizures. She has received educational services since the age of eighteen months from the Children's Development Center (CDC), a cooperative special education program serving severely and multiply handicapped children from several local county school districts, administered by the Superintendent of the Tulsa County Public Schools.[1] Natalie and her family are legal residents within the Independent School District No. 4 of Bixby, Tulsa County, Oklahoma (the Bixby school district), which is, in turn, a member of the CDC cooperative program. CDC operates for nine months of the year, September through May. The Bixby school district does not provide a structured summer program for its severely and multiply handicapped children.

During the nine months of the regular school year, Natalie attended the CDC. For four years, 1982–1986, she attended a recreational day camp for handicapped children run by the Tulsa Association for the Retarded (TAR) during six weeks in the summer. The parties dispute whether this day camp experience had a positive educational effect on Natalie or whether it was tantamount to no structured educational program.

In January 1987, at the regular annual meeting held to plan Natalie's educational program, the Johnsons requested that Natalie be provided with a structured summer educational program. This request was denied after a separate meeting was held in April 1987 to discuss the issue. The Johnsons then invoked the due process procedures defined by the Act, beginning with a hearing before an administrative hearing officer appointed by the Oklahoma State Department of Education.

At the hearing, the Johnsons presented evidence in the form of testimony from Natalie's mother and from the social worker for Natalie's family, R. Vol. II, tr. at 9–33, 58–85, as well as written opinions from her pediatrician, her neurologist, and a psychologist who evaluated Natalie. R. Vol. II. All agreed that she needed to continue her experience in a structured educational setting during the summer months to prevent regression.

The school district presented testimony from Natalie's classroom teacher and her speech therapist for the 1985–86 and 1986–87 school years. Both teachers testified that, in fact, Natalie had not regressed during the summer of 1986 even though she had not participated in an extended school year program during that period. R. Vol. II, tr. at 89–90, 99–101.

1. The cooperative provision of services is statutorily approved by Okla. Stat. tit. 70, § 13–101 (1989 & Supp.1990), which provides in pertinent part:

   Two or more school districts may establish cooperative programs of special education for exceptional children when such arrangement is approved by the State Board of Education. The county superintendent of schools of any county may establish and maintain a special education program, with the approval of the State Board of Education, and county funds may be expended for such purpose. Any school district or districts located wholly or in part in a county may participate in any such program so established by the county superintendent of schools and shall have authority to contribute school district funds, either directly or by reimbursement to the county participating in such program....

   It shall be the duty of each school district to provide special education for all exceptional children as herein defined who reside in that school district. This duty may be satisfied by:
   . . . .
   2. The district joining in a cooperative program with another district or districts to provide special education for such children....

The hearing officer found that Natalie's educational record did not provide objective documentation of improvement or lack of regression, despite her teachers' optimistic testimony. R. Vol. II, Hearing decision, findings of fact, ¶¶ 7, 8. The hearing officer concluded that an extended school year program was not warranted for Natalie. The hearing officer's decision was based, first, on the legal premise that predictions of future regression are insufficient to compel the schools to provide an extended school year to a handicapped child, and, second, on the factual finding that Natalie's parents failed to demonstrate that Natalie had in fact regressed during the summer of 1986.

Natalie's parents appealed the decision, and the appeals officer affirmed the hearing officer's decision, stating that "[a]ll parents are encouraged to supplement their children's required education in an effort to maximize the individual child's potential; but, this additional effort is not the School's responsibility." R. Vol. II, Appeal Review Decision at 3.

Natalie's parents then filed this action against the Bixby school district, the CDC and the Oklahoma State Department of Education (collectively referred to as "the schools") in the district court for the Northern District of Oklahoma, seeking judicial review of the decision. No additional evidence was offered by either party and the matter was referred to a magistrate following cross motions for summary judgment. The magistrate issued a report and recommendation stating that the preponderance of the evidence indicated that Natalie could be predicted to regress during the summer months without a structured summer program, and concluding that, pursuant to the Act, the schools must provide Natalie with a structured summer educational program as a continuation of her program during the regular school year. R. Vol. I, tab 27.

However, the district court, basing its decision on the same regression evaluation standard used by the administrative hearing officer, found the evidence that Natalie had not regressed during the previous summer, presented by two teachers who had worked with Natalie on a daily basis for many months, to be more compelling than the predictions of outside experts, who had less continuous contact with the child, that such a summer program would prevent regression in the future. The district court therefore granted the schools' motion for summary judgment, holding that, as a matter of law under the Act and the Oklahoma statute, the Bixby school district was not required to provide an extended school year program to Natalie. Johnson v. Independent School District No. 4, No. 88–C–340–C (N.D.Okla. June 5, 1989). Natalie's parents appealed.

II.

This court has jurisdiction on appeal pursuant to § 1415(e) of the Act, and 28 U.S.C. § 1291 (1989). *See also Hendrick Hudson District Board of Education v. Rowley*, 458 U.S. 176, 186 n. 9, 102 S.Ct. 3034, 3041 n. 9, 73 L.Ed.2d 690 (1982) (the court has jurisdiction over an issue which evades review yet is capable of repetition).

The final district court order in this case was grant of the schools' motion for summary judgment.

We review the summary judgment orders *de novo*, applying the same legal standard used by the district court under Rule 56(c) of the Federal Rules of Civil Procedure. Summary judgment should be granted only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When applying this standard, we are to examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. However, the nonmoving party may not rest on his pleadings; the party must set forth specific facts showing that there is a genuine issue for trial.

*Abercrombie v. City of Catoosa*, 896 F.2d 1228, 1230 (10th Cir.1990) (citations omitted).

In *Hendrick Hudson District Board of Education v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), the Su-

preme Court established a twofold inquiry for district courts to use in determining whether the Act's requirements have been met: (1) Has the State complied with the procedures set forth in the Act? (2) Is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? *Id.* 458 U.S. at 206–07, 102 S.Ct. at 3051.

■ The legal standard to be used by the district court in considering each of these issues is set forth in the Act: "In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2); *see Polk v. Central Susquehanna Intermediate Unit 16,* 853 F.2d 171, 173 (3d Cir.1988), *cert. denied,* 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989).[2] This case was submitted to the district court on the administrative record, including a transcript of the administrative hearing. Thus, our review includes *de novo* factual analysis based on that administrative record, as well as *de novo* legal analysis of the issues presented.

■ The parties should note that the burden of proof in these matters rests with the party attacking the child's individual education plan. In *Alamo Heights Independent School District v. State Board of Education,* 790 F.2d 1153 (5th Cir.1986), the Fifth Circuit reiterated that the Act "placed primary responsibility for formulating handicapped children's education in the hands of state and local school agencies in cooperation with each child's parents." In deference to this statutory scheme and the reliance it places on the expertise of local education authorities, ... the Act creates a "presumption in favor of the education placement established by [a child's individualized education plan]," and "the party attacking its terms should bear the burden of showing why the educational setting established by the [individualized education plan] is not appropriate."

*Id.* at 1158 (quoting *Tatro v. Texas,* 703 F.2d 823, 830 (5th Cir.1983), *aff'd,* 468 U.S. 883, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984)) (footnotes omitted).

### III.

States which elect to receive federal funds under the Act must provide all handicapped children with the right to a "free appropriate public education." 20 U.S.C. § 1412(1). Under the Act, each child's substantive educational program must be defined by an annual individual educational plan (IEP) developed by the local school district in consultation with the child's parents. 34 C.F.R. §§ 300.340–.345. The IEP must include the specific goals, teaching methods, and evaluation procedures appropriate to that child's educational needs. *Id.* § 300.346. Each child's IEP must be revised at an annual meeting of the teachers and therapists who work with the child, his or her parents, and local school district special education administrators (IEP meeting). *Id.* §§ 300.341–.345. If the child's special education placement or program as defined by the IEP is disputed by the child's parents, the Act sets forth a procedure by which the IEP is to be reviewed by

---

**2.** The court in *Campbell v. Talladega County Board of Education,* 518 F.Supp. 47 (N.D.Ala. 1981), explained that:

The preponderance of the evidence standard codified at 20 U.S.C. § 1415(e)(2) reflects a decision to accord a greater role in the enforcement scheme to the federal courts. The original House version which provided that the determination of the state agency would be "conclusive in any court of the United States if supported by substantial evidence" was rejected by the conference committee and the present language was substituted.

*Id.* at 53 n. 9 (citation omitted); *see also David D. v. Dartmouth School Comm.,* 775 F.2d 411, 420 (1st Cir.1985) (federal courts do not have to assume deference to the administrative hearing officers' decisions under the Act, for to do so would be tantamount to elevating the decisions of the administrative hearing officer to that of the highest state court, clearly an inappropriate outcome), *cert. denied sub nom. Massachusetts Dept. of Educ. v. David D.,* 475 U.S. 1140, 106 S.Ct. 1790, 90 L.Ed.2d 336 (1986).

an impartial hearing officer through the administration of the state education agency. 20 U.S.C. §§ 1415(a), (b), (d); 34 C.F.R. §§ 300.500–.508. The decision of the hearing officer may be appealed to an appeals hearing officer, also appointed by the state educational agency. 20 U.S.C. § 1415(c); 34 C.F.R. §§ 300.509–.510. That decision may be reviewed in an action brought in state court or in the local federal district court. 34 U.S.C. § 1415(e); 34 C.F.R. § 300.511.

We are bound by the Act, which rests on the cornerstone of granting handicapped children entitlement to a "free appropriate public education," 20 U.S.C. § 1412(1), based on an individually designed education plan revised at least annually. *Id.* at § 1414(a)(5); *Rowley*, 458 U.S. at 203, 102 S.Ct. at 3049. The individualization requirement is of paramount importance in the Act. 20 U.S.C. §§ 1401(a)(19), 1412(2)(B); *Rowley*, 458 U.S. at 188–89, 198, 202, 102 S.Ct. at 3041–42, 3046, 3048, *Polk*, 853 F.2d at 172; *Battle v. Pennsylvania*, 629 F.2d 269, 280 (3d Cir.), *on remand*, 513 F.Supp. 425 (E.D.Pa.1980), *cert. denied sub nom. Scanlon v. Battle*, 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981). While it would be easier for those involved in administrative review under the Act to have one and only one criterion for evaluating the appropriateness of a handicapped child's IEP, the handicapping impediments which force individualization of the child's education program in the first place also mandate an individualized approach to review of the child's IEP.

The amount of regression suffered by a child during the summer months, considered together with the amount of time required to recoup those lost skills when school resumes in the fall, is an important consideration in assessing an individual child's need for continuation of his or her structured educational program in the summer months. In *Alamo Heights*, the Fifth Circuit explained this "regression-recoupment" analysis, which plays an integral part in the case before us today:

As we stated in *Crawford v. Pittman* [708 F.2d 1028 (5th Cir.1983)], "The basic substantive standard under the Act,

then, is that each IEP must be formulated to provide some educational benefit to the child," in accordance with "the unique needs" of that child. The some-educational-benefit standard does not mean that the requirements of the Act are satisfied so long as a handicapped child's progress, absent summer services, is not brought "to a virtual standstill." Rather, if a child will experience severe or substantial regression during the summer months in the absence of a summer program, the handicapped child may be entitled to year-round services. The issue is whether the benefits accrued to the child during the regular school year will be significantly jeopardized if he is not provided an educational program during the summer months.

790 F.2d at 1158 (citations omitted).

However, the regression-recoupment analysis is not the only measure used to determine the necessity of structured summer program. In addition to degree of regression and the time necessary for recoupment, courts have considered many factors important in their discussions of what constitutes an "appropriate" educational program under the Act. These include the degree of impairment and the ability of the child's parents to provide the educational structure at home, *Battle*, 629 F.2d at 280; the child's rate of progress, his or her behavioral and physical problems, the availability of alternative resources, the ability of the child to interact with non-handicapped children, the areas of the child's curriculum which need continuous attention, and the child's vocational needs, *Yaris v. Special School Dist.*, 558 F.Supp. 545, 551 (E.D.Mo.1983), *aff'd*, 728 F.2d 1055 (8th Cir.1984); and whether the requested service is "extraordinary" to the child's condition, as opposed to an integral part of a program for those with the child's condition. *Polk*, 853 F.2d at 182. In fact, the Third Circuit recently explicitly rejected using solely a regression analysis to determine the necessity of a summer program under the Act:

[A] serious problem ... lies in defendants' implicit suggestion that a child

must first show regression before his parents may challenge the appropriateness of his education.... [W]e do not believe that Congress intended that courts present parents with the Hobson's choice of allowing regression (hence proving their claim) or providing on their own what their child needs to make meaningful progress.

*Polk,* 853 F.2d at 184.

In *Rowley,* the Supreme Court explicitly held that administrative and court review may not limit analysis of the appropriateness of the IEP to any single criterion. "We do not attempt today to establish any one test for determining the adequacy of educational benefits conferred upon all children covered by the Act." 458 U.S. at 202, 102 S.Ct. at 3049; *see also Yaris,* 558 F.Supp. at 558. This restraint is as applicable to a specific educational program element, such as whether a child should be provided a structured summer educational experience, as it is to a generalized issue such as the "adequacy of educational benefits conferred upon all children covered by the Act." *Rowley,* 458 U.S. at 202, 102 S.Ct. at 3049; *see also Crawford,* 708 F.2d at 1034 n. 28 (declining to state whether the "regression-recoupment syndrome" should be used as a test to narrow the class of children to whom a summer program must be offered).

■ We prefer to adopt the Fifth Circuit's broad premise, as articulated in *Alamo Heights:*

> The issue is whether the benefits accrued to the child during the regular school year will be significantly jeopardized if he is not provided an educational program during the summer months. This is, of course, a general standard, but it must be applied to the individual by [those drafting and approving the IEP] in the same way that juries apply other general legal standards such as negligence and reasonableness.

790 F.2d at 1158.[3] The analysis of whether the child's level of achievement would be jeopardized by a summer break in his or her structured educational programming should proceed by applying not only retrospective data, such as past regression and rate of recoupment, but also should include predictive data, based on the opinion of professionals in consultation with the child's parents as well as circumstantial considerations of the child's individual situation at home and in his or her neighborhood and community.[4]

■ In so holding, we are mindful of the Supreme Court's caution in *Rowley* that

---

**3.** The *Alamo Heights* case, in which the court found that the child in question should receive a structured summer educational program, resembles the case before the court today in that the testimony concerning the child's regression-recoupment tendencies was directly conflicting: "[T]he School District's employees and consultants were unanimous that they observed no significant regression, while the doctors, therapists, and former teachers who testified on behalf of [the child] all agreed that [the child] required a continuous structured program in order to prevent significant regression." *Id.* at 1159.

**4.** We are aware that at least one district court has limited the provision of summer educational programs to those children who can prove irreparable regression. In *Bales v. Clarke,* 523 F.Supp. 1366 (E.D.Va.1981), the court held that "[p]laintiff is ... not entitled to year-round schooling without showing an irreparable loss of progress during summer months." *Id.* at 1371. The *Bales* court relied on *Anderson v. Thompson,* 495 F.Supp. 1256, 1266 (E.D.Wis. 1980), *aff'd,* 658 F.2d 1205 (7th Cir.1981) (af-

firming district court denial of compensatory damages and attorney's fees).

We disagree with the *Bales* court, not only in its holding under the Act, but also with its implication that *Anderson* supports its conclusion. In *Anderson,* a case involving a child whose diagnosis and proposed educational program were disputed, the district court, without citing any legal authority, declined to order the local school district to provide a summer program because the student's academic regression was not predicted to be more severe than that of a nonhandicapped student. *Id.* at 1266. *Cf. Rettig v. Kent City School Dist.,* 539 F.Supp. 768, 778–79 (N.D.Ohio 1981) (regression standard is appropriately applied; the child whose program was the subject of this case had displayed periods of regression year-round; "[I]f on the basis of a *multi-factored evaluation,* a new IEP for [the child] called for summer school," the school must so provide with state funding) (emphasis added), *aff'd in pertinent part and partially vacated on other grounds,* 720 F.2d 463 (6th Cir.1983), *cert. denied,* 467 U.S. 1201, 104 S.Ct. 2379, 81 L.Ed.2d 339 (1984).

the "appropriate" education required by the Act is not one which is guaranteed to maximize the child's potential. 458 U.S. at 197 n. 21, 102 S.Ct. at 3046 n. 21; *accord Polk*, 853 F.2d at 178–79; *Muth v. Central Bucks School Dist.*, 839 F.2d 113, 119 (3d Cir.), *cert. denied*, 488 U.S. 838, 109 S.Ct. 103, 102 L.Ed.2d 78 (1988) (as to local school district defendant and grounds pertinent hereto), and *rev'd*, 491 U.S. 223, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989) (only as to state as defendant on 11th Amendment immunity grounds).[5] The Act insures, first, that some services are provided to children who previously had received no services at all. 20 U.S.C. § 1412(3); *see, e.g., Rowley*, 458 U.S. at 201, 102 S.Ct. at 3048 (each child must be provided with a "basic floor of opportunity"); *Polk*, 853 F.2d at 179. Second, it insures that those services which are provided are individualized. 20 U.S.C. § 1412(2)(B). And third, it gives parents the right and obligation to act as the enforcement arm of the entitlement through the procedural safeguards outlined and mandated by the Act. 20 U.S.C. § 1412(5); *Rowley*, 458 U.S. at 205–06, 102 S.Ct. at 3050; *Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 634 (4th Cir.1985). Congress was mindful of the financial burdens which such expanded ser-

vices imposed,[6] and was not utopian in its goals.

The State of Oklahoma is a recipient of federal assistance though the Act, and its legislature has enacted a correlative enabling statute, Okla. Stat. tit. 70, § 13–101 (1989 & Supp.1990) (the Oklahoma statute). The Oklahoma statute includes the provision that, if the child's IEP recommends continuing educational services during the summer, the local school district will be funded to provide a maximum of forty days educational programming during the summer to prevent loss of the educational gains achieved during the nine-month school year.[7]

■ If state legislation implementing the Act grants a broader entitlement than that found in the federal statute, the state statute defines the parameters of the program which must be extended to children living in that state. *See Board of Educ. v. Diamond*, 808 F.2d 987, 992 (3rd Cir.1986); *David D. v. Dartmouth School Comm.*, 775 F.2d 411, 417, 420 (1st Cir.1985) (the Act incorporates state substantive law implementing the Act), *cert. denied sub nom. Massachusetts Dept. of Educ. v. David D.*, 475 U.S. 1140, 106 S.Ct. 1790, 90 L.Ed.2d 336 (1986).

5. It is important to be careful when using the term "maximization" in the educational setting. For example, the district court in *Bales v. Clarke* wrote as if the phrase "'maximizing' the plaintiff's educational opportunities" were synonymous with the idealistic goal of "'maximum educational progress' through the 'best' education available, without regard to costs." 523 F.Supp. at 1371. However, these concepts are not synonymous. The former describes making the best use of the educational program which has been determined to be appropriate for the child, including balancing the needs of the local school district with the resources available to meet those needs. The latter describes the utopian ideal of providing unlimited services to every child, a goal which has been uniformly recognized as unreachable and inappropriate, given the press of needs in our communities. The former is mandated by the Act; the latter is not. Indeed, most professional educators would agree that it is a theoretical as well as a physical and financial impossibility to establish an educational program which "maximizes" each child's educational potential.

6. These financial burdens have offsetting financial benefits. *See Polk*, in which the Third Circuit stated:

A chief selling point of the Act was that although it is penny dear, it is pound wise—the expensive individualized assistance early in life, geared toward teaching basic life skills and self-sufficiency, eventually redounds to the benefit of the public fisc as these children grow to become productive citizens.

853 F.2d at 181–82; *accord Rowley*, 458 U.S. at 201 n. 23, 102 S.Ct. at 3048 n. 23.

7. Okla. Stat. tit. 70, § 13–101 provides in pertinent part:

Funds may be expended for school services for an additional period not to exceed forty (40) days during the summer months for approved programs for qualified children, who are severely or profoundly multiple-handicapped, provided their individualized education program (I.E.P.) states the need for a continuing educational experience to prevent loss of educational achievement or basic life skills.

However, the Oklahoma statute is not broader than its federal counterpart in its provision for funding for forty days of summer programming under an IEP. The Third, Fifth, Eighth and Eleventh Circuits have all held that under the Act itself, states must provide a continuous educational experience through the summer under the child's IEP if that is the "appropriate" educational experience for the handicapped child's situation. *Georgia Ass'n of Retarded Citizens v. McDaniel*, 716 F.2d 1565, 1576 (11th Cir.1983), *modified on other grounds*, 740 F.2d 902 (1984), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1228, 84 L.Ed.2d 365 (1985); *Crawford*, 708 F.2d at 1034; *Yaris*, 558 F.Supp. at 559; *Battle*, 629 F.2d at 281. Thus, the federal statute's mandate of a "free appropriate public education," as judicially interpreted, includes the provision for a summer program if appropriate under a child's IEP. It follows that the Oklahoma statute, while assuring local school districts that state funding will cover a forty-day structured educational program during the summer for a child's individualized program, does not expand the federal statute.

To the extent that the Oklahoma statute has been interpreted to require the party attacking the child's proposed IEP to prove that the child has already experienced significant regression with ineffective recoupment of educational or basic life skills, or could be predicted to experience such regression during summer months, in isolation from any other elements which may be important to an individualized assessment of the child's situation, the Oklahoma statute is actually more restrictive than the federal entitlement, rather than more expansive. We cannot reconcile that interpretation with the individualized review demanded by the Act. As an example which is not uncommon, what of the child who has not shown regression in the past, but for whom other factors, such as acceleration of his or her deficiencies with increased physical maturity, outweigh the lack of past egregious regression? Under the Act, both documentation concerning past regression and predictions of future regression should be considered, an analysis which requires investigation into many aspects of the child's educational, home, and community life.

■■■ Turning to the case before us, a thorough review of the entire administrative record reveals it to be focused exclusively on a limited regression-recoupment analysis, which itself is vigorously disputed with opposing competent testimony and evidence.[8] Because of the conflict in evidence concerning Natalie's past regression, other factors, including some or all of those discussed above,[9] should have been considered as part of the evaluation of whether Natalie's IEP is "appropriate" for her individual circumstances. However, there was scant factual development in the record from the administrative proceedings concerning many aspects of Natalie's life.[10]

---

8. This dispute alone, concerning material factual matters, renders inappropriate the district court's grant of summary judgment.

9. The list of possible factors includes the degree of impairment, the degree of regression suffered by the child, the recovery time from this regression, the ability of the child's parents to provide the educational structure at home, the child's rate of progress, the child's behavioral and physical problems, the availability of alternative resources, the ability of the child to interact with nonhandicapped children, the areas of the child's curriculum which need continuous attention, the child's vocational needs, and whether the requested service is extraordinary for the child's condition, as opposed to an integral part of a program for those with the child's condition. This list is not intended to be exhaustive, nor is it intended that each element would impact planning for each child's IEP.

10. *E.g.*, the record reveals that for at least two summers, 1985 and 1986, Natalie's parents had applied for her participation in the "Laura Dester program," a program run by the Oklahoma Department of Human Services for handicapped children living at home. The program is apparently one of nonprofessionals working with parents in the home during the summer, using the child's IEP for guidance. The record is completely undeveloped as to whether there is any cost to the parents for this program, or why Natalie did not attend it. The record also contains an unexplained school memo to file indicating that a speech pathologist from the Laura Dester program who was assigned to work with Natalie during the summer of 1986 visited her classroom to observe the techniques Natalie's teacher was employing, although in fact Natalie did not attend the program in 1986.

Because the record focuses so completely on only one component of Natalie's education, we do not have sufficient facts to make an informed disposition on the merits of this case, and we therefore express no opinion as to whether the Natalie's IEP is "appropriate" under the Act's mandate. We do hold, however, that those who conducted the administrative review, the administrative appeal, and the federal district court review of that administrative process erred by converting what should have been a multifaceted inquiry into application of a single, inflexible criterion.

As to the first issue, therefore, we reverse summary judgment in favor of the schools and remand the case for further proceedings, which should include presentation and consideration of evidence concerning other factors in addition to the regression-recoupment evaluation previously conducted, relevant to a decision as to whether a structured educational summer program should be included as part of Natalie's IEP.

## IV.

■ As to the second issue, whether the CDC is a necessary party to the suit, the hearing officer did not render any finding or conclusion. The appeals officer found that the CDC was not a necessary party because Natalie's program is the legal responsibility of the local education agency, the Bixby school district, "under state and federal law and regulation." Appeal review decision at 2, 3 (citing the Oklahoma statute and 34 C.F.R. § 506). The magistrate held: "The Children's Developmental Center is not a proper party to this action, being a cooperative effort pursuant to 70 O.S. § 13–101(2)." Report and Recommendation at 19 n. 15. The district court found that it did not need to address the issue after it granted the schools' motion for summary judgment.[11]

Section 1415(b)(2) of the Act provides that:

> Whenever a complaint has been received under paragraph (1) of this subsection, the parents or guardian shall have an opportunity for an impartial due process hearing which shall be conducted by the State educational agency or by the local educational agency or intermediate educational unit, as determined by State law or by the State educational agency.

The Oklahoma State Department of Education has designated the "local education agency" as the proper party to respond to a parental request for due process review of a child's placement or program. *See Policies and Procedures Manual for Special Education in Oklahoma* at 53 (1988). By letter to counsel for the Johnsons dated June 5, 1987, the Oklahoma State Department of Education clarified that their request for review of Natalie's program must be forwarded to the superintendent of the Bixby Public Schools.

In theory, the CDC could be considered a "local educational agency" under the definitions given in the Act and in the regulations implementing the Act, *see* 20 U.S.C. §§ 1401(a)(8), 1401(a)(22); 34 C.F.R. § 300.8. However, the Act states clearly that the request for due process review is to be made to only one party, which may be designated by the state board of education. 20 U.S.C. § 1415(b)(2) (The "due process hearing ... shall be conducted by the State educational agency *or* by the local educational agency *or* the intermediate educational unit, *as determined by ... the State educational agency.*") (emphasis added). The Oklahoma State Board of Education has designated the local school district as the responsible party, consistent with the Act.[12] Thus, the CDC is not a necessary party to this action.

---

11. On appeal, the schools argue that this issue is not properly before us because Natalie's counsel did not address it in the complaint before the district court. The district court stated that, "The plaintiff has not specifically objected to this conclusion." Order at 4. However, the record reveals that the complaint specifically and repeatedly requested federal court review of this issue. *See, e.g.,* R. Vol. I, tab 1 at 4–7. This

comment of the district court was plain error, but the error is harmless under our holding today.

12. At the hearing, the hearing officer sustained the schools' objections to questions about whether any of the seven other children in Natalie's class at the CDC were attending summer programs. The schools' objections were based

The order of the district court is RE-VERSED and the matter is REMANDED for further proceedings consistent with this opinion.

in part on the fact that the programs for other children were not relevant to Natalie's program, and in part that other students "are not even students this school district has any responsibility for." R. Vol. II, tr. at 103.

Under our holding today, it is clear that the question of what services are regionally available to a child with a particular handicap can be relevant to the evaluation of the schools' responsibility to provide a structured summer educational program. We trust that our intent to encourage broad information gathering during the evaluation process is clear, and that on remand, all relevant information will be included, in an attempt to achieve the balance of individual need and public resources which Congress envisioned.