**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 6, 2005**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

T.W., by and through his parents,
Madeline McCullough and Michael
Wilson,

        Plaintiff-Appellant,

v.

UNIFIED SCHOOL DISTRICT NO.
259, WICHITA, KANSAS,

        Defendant-Appellee.

No. 04-3093
(D.C. No. 01-CV-1406-MLB)
(D. Kan.)

**ORDER AND JUDGMENT** *

Before **SEYMOUR** , **KELLY** , and **McCONNELL** , Circuit Judges.

After examining the briefs and appellate record, this panel has determined

unanimously to grant the parties' request for a decision on the briefs without oral

argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore

ordered submitted without oral argument.

---

\*    This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Plaintiff-appellant T.W. is a child with Down syndrome. Through his parents, Madeleine McCullough and Michael Wilson, he appeals from the district court's order granting summary judgment in favor of defendant Unified School District No. 259, Wichita, Kansas ("District 259"), on his complaint brought under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1487. We affirm the district court's grant of summary judgment to District 259.

## FACTS [1]

T.W. was born on August 24, 1992. From 1995 until 1998, he was in Early Childhood Special Education classes, and he was home-schooled for most of the 1998-99 school year. T.W.'s mother proposed that he begin the fall 1999 semester in a kindergarten inclusion placement, with regular education students.

In District 259, decisions about placement for special education students are made by a multi-disciplinary team called the IEP team. The team includes educational professionals (referred to collectively as the "child study team") and the child's parents. If a child is identified as requiring special education services,

---

[1] In an abundance of caution, we have considered the evidence in the record to which the plaintiff has referred in his briefs in this court. Because we affirm summary judgment in favor of the defendant, it is not necessary to rule on the defendant's objection to the use of extra-stipulation evidence. We note, moreover, that in the district court the defendant submitted a "statement of *additional* uncontroverted facts" citing evidence outside of the stipulation.

the IEP team conducts a comprehensive evaluation and prepares an Individual Education Plan ("IEP") for the child. The IEP addresses the child's present level of performance, his goals and objectives, and the related services the child needs. Once the goals and objectives are set, the team makes a decision on the best placement for the child.

The child study team that evaluated T.W. recommended in May 1999 that T.W. be placed in a self-contained classroom for developmentally disabled children. [2] T.W.'s parents disagreed; they wanted him to begin the fall 1999 semester in an inclusion placement at Emerson Elementary School (Emerson), where his brother, cousins, and neighbors attended school. The IEP team agreed to a nine-week trial placement in the regular education kindergarten classroom at Emerson, beginning in August 1999.

In the spring of 1999 Cathy Hersh, a District 259 licensed school psychologist, performed a number of tests on T.W., including the Bracken Basic Concept Scale-Revised, the Woodcock Johnson Test of Achievement-Revised, and an informal assessment of his skills through play. On the Broad Knowledge and Skills portion of the Woodcock Johnson Test, T.W. scored in the .1

---

[2]    The parties, the administrative decision-makers, and the district court frequently referred to this placement as a "self-contained mental retardation classroom." While there is no evidence that their use of the term was intended in any way to be derogatory, we consider this term stigmatizing and hence will use alternative expressions to refer to T.W.'s placement.

percentile, giving him an age equivalency of three years, two months. On the Broad skills portion, he scored in less than the .1 percentile, giving him an age equivalency of two years.

During his placement at Emerson, T.W. received physical therapy, occupational therapy, speech therapy, and adaptive physical education. He also benefited from the services of a paraeducator (para) who accompanied him in class. An IEP for the trial placement was developed on August 27, 1999, and revised on October 12, 1999, to provide that T.W. spend 30-45 minutes twice a day in an interrelated classroom with other developmentally disabled students. Since the parents by this time had initiated due process proceedings, T.W. remained in the regular education class after the nine-week period under IDEA's "stay put" provisions. *See* 34 C.F.R. § 300.514(a).

T.W.'s experience in the regular classroom did not go well. His teachers testified that not only was he unable to perform tasks performed by the other children in his class, but that the academic tasks he could perform often bore no resemblance to what the other children were learning. T.W. frequently became frustrated and acted out, disturbing the other children and disrupting the class. When this happened, he was removed from the classroom or placed in time out, interrupting classroom activities. While T.W.'s behavior and abilities improved to some degree over the course of each school year, nearly all of his teachers and

the staff providing supplementary services concluded that a regular classroom placement was inappropriate for T.W. and that he would do much better in a self-contained classroom.

Another IEP conference was held on December 21, 1999, and a proposed IEP was developed. After the IEP team recommended placement in a self-contained classroom, T.W.'s parents walked out of the meeting without signing the IEP.

In September 2000, the IEP team met and went through T.W.'s stay-put IEP. The team marked the objectives he had mastered and the percentages at which he had mastered them. Not all of his performance levels were updated and there were no revisions to his goals and objectives at that time.

The parties engaged in due process hearings before an independent hearing officer (IHO) over a period of approximately twenty days. The IHO determined that T.W.'s proposed placement in a self-contained classroom met the IDEA's Least Restrictive Environment (LRE) requirement; that the December 1999 IEP was reasonably calculated to provide him with a Free Appropriate Public Education (FAPE); that District 259 had included the appropriate elements in the inclusion trial placement; and that District 259 had not wrongfully refused to update and revise the stay-put IEP.

An administrative reviewing officer affirmed the hearing officer's decision. Plaintiff then sought review in district court. The district court entered summary judgment in favor of the defendant, and denied plaintiff's motion for summary judgment.

Over two dozen witnesses testified before the IHO, producing a very voluminous record. The parties are familiar with the facts, and we will not attempt here to describe the extensive testimony comprehensively. Instead, we will cite to specific, relevant portions of the record as necessary.

STANDARD OF REVIEW

IDEA proceedings do not follow the deferential "substantial evidence" test typical in judicial review of administrative proceedings. Instead, the reviewing court must independently decide whether the IDEA requirements have been met. *Murray v. Montrose County Sch. Dist. RE-1J*, 51 F.3d 921, 927 (10th Cir. 1995). "The district court must therefore independently review the evidence contained in the administrative record, accept and review additional evidence, if necessary, and make a decision based on the preponderance of the evidence, while giving 'due weight' to the administrative proceedings below." *Id.* (quotation omitted).

This "due weight" standard means that the IHO's factual findings are considered prima facie correct. *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d

966, 974 (10th Cir. 2004).  Also, "[t]he district court's proceedings must maintain the character of review and not rise to the level of a *de novo* trial." *Id.*[3]

This court reviews the district court's disposition *de novo*, applying the same standard that it applied. *Id.* We do not treat the district court's summary disposition as a "summary judgment" entered under Fed. R. Civ. P. 56 standards, however, because the district court did not attempt to determine whether genuine material issues of fact remained for trial. *See id.* Instead, its disposition was in essence "a judgment on the administrative agency's record," leaving us as a reviewing court to conduct what is essentially a *de novo* review of a final judgment on the merits. *Id.* Finally, we note that "[t]he district court's [legal] interpretations of the [IDEA] are reviewed *de novo*." *Id.*

## ANALYSIS

### 1. Proposed placement in self-contained classroom and LRE

Plaintiff contends that his proposed placement in a self-contained classroom violates the IDEA's LRE provisions.  The IDEA provides that "[t]o the

---

[3]     Plaintiff argues that the hearing officer's decision is entitled to "absolutely no deference" because it fails to resolve factual disputes or to make credibility determinations concerning the testimony of the non-expert witnesses.  Aplt. Opening Br. at 21.  He also charges that the hearing officer adopted the defendant's proposed findings of fact, without adequately comparing them with the transcripts.  Plaintiff's challenges fail to overcome the presumption of correctness attached to the IHO's factual findings, which are generally supported by the record.

maximum extent appropriate, children with disabilities [should be] educated with children who are not disabled." 20 U.S.C. § 1412(a)(5)(A). "[R]emoval of children with disabilities from the regular educational environment [should occur] only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* The practice of integrating children with disabilities in regular classrooms is commonly referred to as "mainstreaming." *Oberti v. Bd. of Educ.*, 995 F.2d 1204, 1207 n.1 (3d Cir. 1993).

The parties disagree concerning who has the burden of proving that the self-contained classroom is the least restrictive environment for T.W. Plaintiff argues that since T.W. is currently placed in a regular classroom (under the IDEA's stay-put provision), District 259 must prove that moving him to a self-contained classroom is consistent with the LRE requirement. District 259 responds that since T.W. is the party challenging the outcome of the state administrative decision, he bears the burden of proof on all issues in this appeal. We recognize that burden of proof issues tend to be difficult in IDEA cases. [4]

---

[4] Our case law holds that the burden of proof under the IDEA rests with the party attacking the child's IEP. *Johnson ex rel. Johnson v. Independent Sch. Dist. No. 4*, 921 F.2d 1022, 1026 (10th Cir. 1990). The Supreme Court has recently granted certiorari on this issue, which has fractured the circuit courts. *Weast v. Schaeffer ex rel. Shaeffer*, 377 F.3d 449 (4th Cir. 2004), *cert. granted*, 125 S. Ct. 1300 (2005).

Regardless of which party bears the burden of proof on the LRE issue in this case, however, the evidence plainly shows that a self-contained classroom is T.W.'s LRE.

In determining whether a school district has complied with the LRE mandate, we follow the so-called *Daniel R.R.* test. *See L.B.*, 379 F.3d at 976-77 (adopting test in *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1048 (5th Cir. 1989)). The *Daniel R.R.* test contains a two-part analysis. First, the court "determines whether education in a regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily." *L.B.*, 379 F.3d at 976. If so, the regular classroom is the child's LRE. If not, the court next "determines if the school district has mainstreamed the child to the maximum extent appropriate." *Id.*

In applying the *Daniel R.R.* test, we consider the following, non-exhaustive factors:

> (1) steps the school district has taken to accommodate the child in the regular classroom, including the consideration of a continuum of placement and support services; (2) comparison of the academic benefits the child will receive in the regular classroom with those she will receive in the special education classroom; (3) the child's overall educational experience in regular education, including non-academic benefits; and (4) the effect on the regular classroom of the disabled child's presence in that classroom.

*Id.*

**A. Steps taken to accommodate T.W. in a regular classroom**

Addressing the first factor, the district court determined that District 259 had taken multiple steps in an attempt to accommodate T.W. in the regular classroom. It further concluded that these steps were entirely sufficient for IDEA purposes. Plaintiff argues that the steps taken to accommodate him were "few and far between." Aplt. Opening Br. at 30. We disagree.

**(1.) Supplementary aids and services**

The IDEA requires schools to make proper use of "supplementary aids and services" that may permit the school to educate a child with disabilities within the regular classroom, while addressing that child's unique educational needs. *Oberti*, 995 F.2d at 1214 (citing 20 U.S.C. § 1412(5)(B), now codified at *id.* § 1412(a)(5)(A)). District 259 provided T.W. with a broad array of supplementary aids and services, including a one-on-one paraeducator, physical therapy, occupational therapy, speech therapy, and adapted physical education.

Plaintiff dismisses these efforts as inadequate to accommodate him in a regular education classroom. He argues that the services provided were ineffective because there was little coordination between the providers of supplementary aids and services and his regular education teachers, and little coordination between the work done by the service providers and his regular education curriculum.

Plaintiff does not cite any specific statutory or regulatory mandate requiring a particular level of coordination between service providers and regular education teachers. Certainly, "[t]he Act does not permit states to make mere token gestures to accommodate handicapped students; its requirement for modifying and supplementing regular education is broad." *Daniel R.R.*, 874 F.2d at 1048. Contrary to plaintiff's assertions, however, the record reveals that T.W.'s service providers frequently consulted with each other, with district special education personnel, and with his regular education teachers, and that they coordinated their efforts concerning T.W.'s education. *See* Aplt. App., Vol. III at 1039 ¶ 42, 1044 ¶¶ 65-66, 1048 ¶ 81, 1051 ¶ 100, 1056 ¶¶ 121-22, 1059 ¶ 134, 1060-61 ¶¶ 144-45, 1068 ¶ 175, 1073 ¶ 201, 1075-76 ¶¶ 209-12, 1085-86 ¶¶ 250-52, 1091 ¶ 276, 1092 ¶ 281; Vol. IV at 1445-47; Vol. V at 1483-84, 1504, 1522, 1551-52, 1603-06, 1639-40, 1644-45, 1712, 1745, 1750, 1756, 1788, 1811-12; Vol. VI at 1855-56, 1863-64, 1889, 1892-93, 1895, 1901, 1906; Vol. VII at 2189, 2197-98, 2207-08, 2228-29.

While these consultations were often conducted on an informal basis, plaintiff fails to show that IDEA mandates regularly scheduled, formal meetings between service providers and teachers. We will not impose such a formal and inflexible requirement on District 259. *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982) (stating IDEA does not provide "an invitation to the courts to

substitute their own notions of sound educational policy for those of the school authorities which they review."). Indeed, plaintiff's own expert recognized that teachers are busy people and that meetings concerning curriculum adaptations at least sometimes must be done "on the run as they're walking down the hallway." Aplt. App., Vol. VII at 2298.

Plaintiff also complains that his service providers did not coordinate their efforts with his regular education curriculum and in fact "did nothing to include T.W. in the regular education classroom." Aplt. Opening Br. at 31. There was testimony that T.W. had difficulty adjusting to learning conditions inside the regular classroom, because he was less familiar with the environment there and the lessons being taught there than he was in the pull-out one-on-one sessions. Aplt. App., Vol. VII at 2218. The record does not bear out his contention, however, that no effort was made to include him in activities in the regular classroom. *See id.*, Vol. Vol. V at 1564-65, 1584, 1711, 1722-23, 1752-53.

Plaintiff also asserts, with support in the evidence, that he was often pulled out of the regular education classroom for sessions with service providers in the middle of a regular classroom project and then returned to the classroom at times other than during scheduled breaks. *See, e.g., id.*, Vol. VII at 2309-11. Apparently, District 259 utilized this procedure to minimize the number of times he came and went from the regular classroom. Donna Wickham, an expert

witness, testified that this sort of interruption leaves a disabled child feeling less responsible for work in the regular classroom and makes other children less likely to see him as a member of the class. While District 259 might have done a better job of scheduling T.W.'s pull-out sessions to coordinate with his regular class schedule, and perhaps provided him better assistance with the transitions, this by itself does not signify an ineffectual attempt at providing supplementary aids and services. We conclude that T.W. received a more than adequate array of supplementary aids and services.

### (2.) Training and support for Emerson staff

Plaintiff argues that the training of his teachers and the Emerson staff was "woefully inadequate." Aplt. Opening Br. at 32. His principal complaint appears to be that the providers and staff were not specifically trained for work with Down syndrome children, or did not have experience with Down syndrome children. *See, e.g.,* Aplt. App. Vol. V at 1541-43. We note, however, that "the IDEA . . . does not require special education service providers to have every conceivable credential relevant to every child's disability." *Hartmann ex rel. Hartmann v. Loudon County Bd. of Educ.*, 118 F.3d 996, 1004 (4th Cir. 1997). The weight of the evidence shows that T.W.'s teachers and District 259's special education staff in fact had adequate training and/or experience to work with T.W.'s needs. *See* Aplt. App. Vol. III at 1036 ¶ 31, 1040 ¶ 49, 1044 ¶ 67, 1049

¶ 84, 1050 ¶ 90, 1051 ¶ 98, 1054 ¶ 114; Vol. IV at 1375, 1404, 1417-19, 1454-55; Vol. V at 1500-01, 1507, 1516, 1523, 1545-47, 1571, 1585, 1592-94, 1596-98, 1648-49, 1686-87, 1742-43, 1745-46, 1751-54, 1792, 1804-05; Vol. VI at 1842-43, 1845, 1865-68; Vol. VII at 2167-68, 2211.

Marsha Sears, T.W.'s occupational therapist, for example, had thirty years' experience in that field, and had attended workshop training on inclusion techniques. Marilyn Albert, his speech therapist, had a master's degree in speech/language and nearly eleven years' experience in District 259. Stella Holtzclaw, T.W.'s kindergarten teacher at Emerson, was given a book and a video about working with children with Down syndrome and articles on inclusion. She received assistance during the school year from District 259 personnel, including its special education coordinator, its teaching specialist with expertise in functional curriculum and behavior improvement plans, and other district personnel. Darla Loggans, T.W.'s first grade teacher, had prior experience with including and teaching special education children. She attended a district in-service on inclusion, did internet research concerning Down syndrome, and consulted with other district personnel concerning T.W.'s education. Although Pat Mhate, the District's special education teacher, had not previously worked with a Down syndrome child, she did reading and research to prepare for his arrival at Emerson and sought advice from a friend who was a professor of early

childhood development. We conclude that T.W.'s teachers and the Emerson staff received adequate training and support.

### (3.) T.W.'s behavior intervention plan

The IDEA regulations indicate that "in the case of a child whose behavior impedes his or her learning or that of others" the IEP team should consider "positive behavioral interventions, strategies, and supports to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. § 300.346(a)(2)(i). Plaintiff argues that District 259 "has never provided T.W. with appropriate behavior supports." Aplt. Opening Br. at 34. We disagree.

District 259 developed a behavioral intervention plan (BIP) for T.W. in August 1999. Plaintiff argues that this plan was inadequate because it was prepared before District 259 had any experience with T.W. and without a proper functional assessment. [5] He also complains that the plan was never revised, even after members of the IEP team had gained more experience with T.W. and his behaviors.

To the extent plaintiff argues that the BIP is substantively deficient, he faces an uphill battle. Neither the IDEA nor its implementing regulations

---

[5] A functional assessment identifies problem behaviors, analyzes why a student engages in them (the events or motivations "triggering" the behavior), predicts when the behaviors are most and least likely to occur, and develops strategies to deal with the behaviors. *See* Aplt. App., Vol. VII at 2381.

-15-

prescribe any specific substantive requirements for a BIP. *See Alex R. ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. #221*, 375 F.3d 603, 615 (7th Cir.), *cert. denied*, 125 S. Ct. 628 (2004). Courts should be leery of creating such substantive requirements "out of whole cloth" where neither Congress nor the Department of Education, the agency charged with promulgating regulations for the IDEA, has done so. *Id.*

In any event, plaintiff fails to show that the BIP was an inadequate accommodation. Connie Coulter, a district teaching specialist, and Dr. Jim Vincent, who had previously developed a behavior plan for T.W.'s parents to use, worked together to develop the BIP. Aplt. App., Vol. V at 1550-51. Admittedly, Dr. Vincent believed that the BIP contained certain deficiencies. He explained that District 259 should have collected data on target behaviors, but failed to do so. *Id.*, Vol. VI at 2125. He also believed that the District should have done a functional assessment of high-risk situations. *Id.* at 2127. Donna Wickham, another expert who observed T.W., also pointed out similar alleged deficiencies in the BIP. *Id.*, Vol. VIII at 2763. Bryna Siegel, another expert witness who observed T.W., testified, however, that the reason the BIP did not work well for T.W. was "not because thought hasn't been put into how to do it or it hasn't been executed right," *id.*, Vol. VI at 1999, but because the principal antecedent to

T.W.'s bad behavior was "developmentally inappropriate instruction" in the regular classroom, *id.* at 2000.

Plaintiff also argues that the BIP should have been modified. Some of T.W.'s teachers expressed concern about the failure to implement a modified BIP. *See id.*, Vol. V at 1616-17, 1664. The evidence shows, however, that District 259 did propose modifications to the plan, which Dr. Vincent thought were "pretty good," *id.*, Vol. III at 1100 ¶ 320, but the district could not implement the modifications because it did not have consent from T.W.'s parents to do so. In any event, Ms. Siegel testified that modifications would not have solved T.W.'s behavioral problems, because their source was the fact that he was being instructed at an inappropriately high level in the regular classroom. *Id.*, Vol. VI at 2001. In sum, the evidence supports the conclusion of the IHO that the behavioral supports were adequate.

### (4.) Modifications to curriculum

Plaintiff argues that modifications to the curriculum to accommodate his disability were "few and far between." Aplt. Opening Br. at 36. At least one of the expert witnesses believed that the adaptations she observed could have been improved. *See* Aplt. App., Vol. VII at 2371-72. T.W.'s para testified that he did not observe any formal planning conferences to develop adaptations. *Id.* at 2171. One of plaintiff's expert witnesses testified that adaptations should be formally

planned rather than being made on-the-spot. *Id.* at 2296-97. Despite these criticisms, the great weight of the evidence shows that T.W.'s teachers did make a significant effort to adapt the curriculum to his needs. *See id.*, Vol. V at 1509-10, 1588-90, 1591-92, 1602, 1634, 1713, 1754-55, 1757, 1760-63, 1767-71, 1773-76, 1777-78, 1787; Vol. VI at 1856-60, 1940-41; Vol. VII at 2228-29, 2234.

With or without specific modification or adaptation, there were many activities that T.W. could and did participate in with the other students. *Id.*, Vol. V at 1533, 1575, 1801-02; Vol. VII at 2186-87, 2192. Often, however, the modifications to the curriculum required were so extreme that T.W.'s activities barely resembled those of his classmates, *id.*, Vol. IV at 1475-76; Vol. V at 1522, 1608-09, 1612-13; Vol. VI at 1930; T.W. could not do the activity even as modified, *id.*, Vol. V at 1780-81; Vol. VI at 1970-72; Vol. VIII at 2668-69; or further modification was simply infeasible, *id.*, Vol. V at 1715; Vol. VI at 1883-84, 2004. Overall, the record establishes that the modifications provided to T.W. were not inadequate.

### (5.) Conclusion

A preponderance of the evidence supports the conclusion of the IHO, affirmed by the district court, that District 259 provided T.W. with sufficient accommodation for purposes of IDEA.

### B. Special education vs. regular classroom

The second factor to be considered under the *Daniel R.R.* test is a comparison of the academic benefits T.W. will receive in the regular classroom with those he will receive in the special education classroom. Pointing to the progress T.W. has made on his IEP goals, plaintiff argues that T.W. can meet the requirements of his IEP in a regular educational environment. This being the case, he argues, a presumption arises that a non-regular educational placement would be improper and could not constitute a FAPE for him, even if he would perform better academically in a self-contained classroom than in a regular classroom.

This argument is greatly weakened, however, if we accept the IHO's conclusion that T.W.'s progress on his IEP goals was *solely* the result of the time he spent in one-on-one instruction in the interrelated room, and that he received *no* benefit from the regular education class. Plaintiff contests the IHO's finding on two grounds. First, he argues that some of his goals must have been met by what he learned in the regular classroom, rather than through one-on-one instruction. Plaintiff fails to quantify the achievements allegedly arrived at solely through regular classroom activities, however, and he provides no solid basis for challenging the IHO's conclusion. The IHO relied for his finding on testimony from witnesses who had worked with T.W. over a long period of time.

Second, plaintiff falls back on his leitmotif in this case: that if T.W. failed to make progress in the regular classroom, it was the fault of his teachers and service providers, and was not due to any personal inability to receive an appropriate education in the regular classroom environment. *See* Aplt. Opening Br. at 41 ("[T]here is absolutely no evidence that T.W. could not be satisfactorily educated in the regular education class *if defendant had provided him with the proper supports and services*."). As we have seen, however, the evidence does not support plaintiff's persistent attacks on the adequacy of the instruction he received.

While there was testimony that T.W.'s IEP goals could be fulfilled in either a regular classroom or a self-contained environment, other testimony indicated that T.W. was receiving no benefit from being in the regular classroom. The IHO, who heard all the testimony, resolved this issue in favor of District 259. His conclusions appear to be supported by a preponderance of the evidence.

Finally, plaintiff argues that T.W. would receive *no* benefit from instruction in the self-contained classroom. He contends that the self-contained placement targets daily living skills that he had already acquired. This description does not adequately portray the functional-based curriculum of the self-contained classroom, which "'gears toward life skills and independent living.'" Aplt. App., Vol. III at 1082 ¶ 233. Susan Rothwell, who teaches the self-contained classroom

-20-

at Emerson, testified that the goal of the classroom is to build "'skills that are required for [students] to live independently, to hold a job, to take care of their home, to manage their finances as much as possible.'" *Id.* With this in mind, students are taught, among other things, "basic information such as months, years, seasons, colors, numbers, and alphabet" and more advanced skills including "learning writing skills; improving fine and gross motor skills; and building pre-reading skills." *Id.* ¶ 234. We cannot agree with plaintiff that T.W. would receive no benefit from instruction in a self-contained classroom.

## C. T.W.'s experience in regular education

Plaintiff contends that T.W.'s overall educational experience in regular education has been positive and beneficial. To the extent plaintiff acknowledges any deficiencies in his regular classroom experience, he unsurprisingly tends to blame them on inadequacies in the instruction he received rather than the unsuitability of the regular classroom for his education. Plaintiff correctly notes that he has made some academic and behavioral progress in the regular classroom. These benefits, however, hardly outweigh the evidence presented that T.W.'s behavior is considerably worse in the regular classroom than in other settings, *see id.*, Vol. V at 1719, 1729, 1789; Vol. VI at 1996-97, and that T.W.'s progress toward achieving his IEP objectives is primarily due to work done in his one-on-one pullout sessions with his related service providers.

### D. Effect of T.W.'s presence in classroom

There is evidence to support plaintiff's contention that T.W.'s classroom presence has had some positive influence on other students, teaching them tolerance for persons with disabilities. On the other hand, a much larger amount of evidence indicates that T.W.'s presence in the regular classroom has often been disruptive. *See, e.g.* , Aplt. App., Vol. III at 1071 ¶ 192; Vol. V at 1615-16, 1788; Vol. VI at 1849; Vol. VIII at 2616-30. Considering the evidence overall, this factor weighs against T.W.'s continued placement in the regular classroom.

### E. Mainstreaming

A preponderance of the evidence supports a conclusion that T.W.'s education cannot be achieved satisfactorily in the regular classroom, even with the use of appropriate supplemental aids and services. This being the case, we move on to the second step in the *Daniel R.R.* test, whether District 259 has mainstreamed T.W. to the maximum extent appropriate. The district court found that plaintiff had failed to address this prong of the analysis, and he also makes no argument on this point in his briefs in this court. *See* Aplt. Opening Br. at 30 n.6. We note, however, that if the district's recommendation is followed, and T.W. is placed in a self-contained classroom, he will continue to have opportunities to interact with regular education students in music, physical education, lunch and recess, and on other occasions as appropriate. *See* Aplt.

App., Vol. III at 1083 ¶ 237. Given the amount of frustration that T.W. has exhibited and his lack of engagement in the regular education classroom, the District 259 staff members serving on his IEP team believed that such a placement would be appropriate. *See id.* at 1039 ¶ 44, 1043 ¶ 61, 1047 ¶ 77, 1053 ¶ 109, 1055 ¶ 119, 1065 ¶ 163, 1069 ¶¶ 181-82, 1080-81 ¶ 228, 1088 ¶ 261. We conclude that District 259 has mainstreamed T.W. to the maximum extent appropriate.

### 2. FAPE in inclusion trial placement

Contending that the nine-week trial placement was "crucial to T.W.'s success in regular education," plaintiff charges that defendant sabotaged that placement by failing to adequately train his teachers, failing to adapt the curriculum for T.W., and failing to adequately communicate with T.W.'s parents during the trial placement. Aplt. Opening Br. at 25. These failures, plaintiff charges, denied him a FAPE. *See* 20 U.S.C. § 1412(a)(1)(A) (requiring states to provide a FAPE to children with disabilities). We have already discussed in some detail, with extensive references to the record, the training and experience of T.W.'s teachers and the adaptations made to the curriculum for him. [6] There is no

---

[6]    While not all of the evidence cited relates specifically to the nine-week initial trial placement, there was significant evidence of teacher training and qualifications relating to this period. There was also evidence of curriculum modifications made during this period. *See* Aplt. App., Vol. V at 1602 (testimony

(continued...)

merit to plaintiff's contention that these alleged failures denied him a FAPE. The only remaining issue pertaining to the alleged sabotage of the trial placement concerns the asserted failure to communicate.

Plaintiff argues the non-controversial point that parents can provide critical information concerning their child's strengths. He further asserts that communication was particularly important during the trial placement. The IDEA regulations specifically discuss communication between schools and parents of children with disabilities. These regulations require schools to inform the parents of the child's progress at least as often as parents of nondisabled children are informed of their children's progress. 34 C.F.R. § 300.347(a)(7)(ii). T.W. fails to show that the amount of contact between the school and his parents did not equal or exceed the amount of communication between the school and the parents of nondisabled children. The IDEA does not require schools to communicate with the parents of disabled children as frequently as the parents may wish.

Plaintiff complains specifically that Ms. Holtzclaw, T.W.'s kindergarten teacher, initially refused to communicate with his parents outside the setting of the formal nine-week parent-teacher conferences. Ms. Holtzclaw explained that she requested that her communication with the parents be limited to formal

_____

[6](...continued)
of Ms. Holtzclaw, T.W.'s kindergarten teacher, that "the curriculum was always modified for [T.W.]."

-24-

contacts because she was unsure of the appropriate district protocols. *See* Aplt. App., Vol. V at 1660. She was also understandably concerned by unsolicited negative comments the parents had made about one of T.W.'s preschool teachers when they completed T.W.'s Emerson enrollment packet. *Id.*, Vol. III at 1064 ¶ 155; Vol. V at 1673-74. In February 2000, after T.W.'s mother wrote to the Emerson teacher liaison requesting regularly scheduled meetings, Ms. Holtzclaw agreed to meet with T.W.'s parents every two weeks. We conclude that the asserted lack of communication does not rise to the level of denying T.W. a FAPE.

### 3. Prejudgment of placement issues

Finally, plaintiff argues that District 259 denied him a FAPE and violated the IDEA by determining his placement without regard to his IEP. He contends that District 259 decided to place him in a self-contained classroom without even considering whether the goals and objectives in his IEP could have been served in the regular education classroom, thus short-circuiting the procedural protections provided by the IEP process.

Plaintiff complains that Pat Mhate, the special education teacher at Emerson, testified that she would have recommended a self-contained placement for T.W. as part of the December 1999 IEP, regardless of the goals and objectives contained in his IEP. *See id.*, Vol. VI at 1936. It is also true, however, that

Ms. Mhate prepared goals and objectives that could be served in either a self-contained classroom or a regular education classroom.  Plaintiff fails to show that the goals and objectives she developed were inappropriate for T.W.  One of plaintiff's experts, in fact, testified that the IEP goals and objectives appeared to be appropriate for T.W.'s level of performance.      *Id.*, Vol. III, at 1136-37 ¶ 470.  Thus, any initial predisposition that Ms. Mhate had in favor of a self-contained placement, based on her prior experience with T.W., does not appear to have fatally infected the IEP process.

Certainly, it is improper for an IEP team to predetermine a child's placement, and then develop an IEP to justify that decision.      *See Spielberg ex rel. Spielberg v. Henrico County Pub. Sch.*   , 853 F.2d 256, 259 (4th Cir. 1988).  This does not mean, however, that district personnel should arrive at the IEP meeting pretending to have no idea whatsoever of what an appropriate placement might be.  "*Spielberg*  makes clear that school officials must come to the IEP table with an open mind.  But this does not mean they should come to the IEP table with a blank mind."  *Doyle v. Arlington County Sch. Bd.*   , 806 F. Supp. 1253, 1262 (E.D. Va. 1992),  *aff'd*, No. 92-2313, 1994 WL 592686 (4th Cir. Oct. 31, 1994).

At the time of the December 1999 IEP, the IEP team already had nearly a semester's worth of experience with T.W.  Their experience had demonstrated that even if appropriate goals and objectives were included in the IEP, it would be

inappropriate and infeasible to implement the IEP in a way that was tied to the regular education curriculum. T.W.'s frustration with instruction in the regular classroom had already led them to recommend additional one-on-one time for him in the interrelated room. Notes from the November 9, 1999, December 14, 1999 and December 21, 1999 IEP team meetings indicate that contrary to plaintiff's assertions, placement issues were in fact discussed in some detail, with pros and cons of the existing trial placement being hashed out by the participants. *See* Aplt. App., Vol. VIII at 2719-27. The preponderance of the evidence supports District 259's position that it did not impermissibly prejudge T.W.'s placement.

CONCLUSION

The judgment of the district court, granting summary judgment for District 259, and denying plaintiff's motion for summary judgment in this IDEA case, is AFFIRMED.

Entered for the Court


Michael W. McConnell
Circuit Judge